# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 21-0030V

| | |
|---|---|
| SHAWN MCKENNA, | Chief Special Master Corcoran |
| Petitioner, | Filed: July 7, 2023 |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*David John Carney*, Green & Schafle LLC, Philadelphia, PA, for Petitioner.

*Amanda Pasciuto*, U.S. Department of Justice, Washington, DC, for Respondent.

### DECISION AWARDING DAMAGES[1]

On January 4, 2021, Shawn McKenna filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that he suffered a shoulder injury related to vaccine administration ("SIRVA"), a defined Table injury, after receiving an influenza ("flu") vaccine administered on December 24, 2019. Petition at 1, ¶¶ 3, 19. Because the parties reached an impasse in their settlement discussions,[3] I ordered briefing on entitlement and

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[3] After approximately two months of settlement discussions, the parties requested that I determine entitlement. Status Report, filed Aug. 29, 2022, ECF No. 28. Petitioner also asked that I determine the appropriate amount of damages. *Id.*; *see* Petitioner's Motion for Ruling on the Record and Brief in Support of Damages ("Brief"), filed Oct. 18, 2022, ECF No. 33.

damages together. Thereafter, Respondent conceded entitlement, and the parties completed their briefing on damages.[4]

For the reasons described below, I find that Petitioner is entitled to an award of damages in the amount **$65,000.00 for actual pain and suffering.**

## I.   Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my

---

[4] Respondent's Rule 4(c) Report, filed Oct. 21, 2022, ECF No. 34; Respondent's Brief on Damages ("Opp."), filed Feb. 1, 2023, ECF No. 42; Petitioner's Reply in Support of Brief ("Reply"), filed Feb. 13, 2023, ECF No. 43.

predecessor Chief Special Masters) adjudicating similar claims.[5] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by a decision of the Court of Federal Claims several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* instead emphasized the importance of assessing pain and suffering by looking to the record evidence specific to the injured individual, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

## II.     Prior SIRVA Compensation Within SPU[6]

### A.     Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of July 1, 2023, 3,304 SPU SIRVA cases have resolved since the inception of SPU on July 1, 2014. Compensation was awarded in 3,211 of these cases, with the remaining 93 cases dismissed.

1,834 of the compensated SPU SIRVA cases were the result of a reasoned ruling that petitioner was entitled to compensation (as opposed to a settlement or concession).[7]

---

[5] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

[6] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[7] The remaining 1,377 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Because multiple competing factors may cause the parties to settle a case (with some having little to do with the merits of an underlying claim), these awards from settled cases do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

In only 173 of these cases, however, was the amount of damages *also* determined by a special master in a reasoned decision.[8] As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable precedent setting forth what similarly-situated claimants should also receive.[9]

The data for all groups described above reflect the expected differences in outcome, summarized as follows:

|  | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated Agreement**[10] |
|---|---|---|---|---|
| **Total Cases** | *173* | *1,632* | *29* | *1,377* |
| **Lowest** | $40,757.91 | $22,500.00 | $45,000.00 | $5,000.00 |
| **1st Quartile** | $70,203.12 | $62,825.18 | $90,000.00 | $38,134.81 |
| **Median** | **$92,299.83** | **$83,039.25** | **$130,000.00** | **$55,000.00** |
| **3rd Quartile** | $125,000.00 | $111,475.61 | $162,500.00 | $80,803.17 |
| **Largest** | $265,034.87 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### B. Pain and Suffering Awards in Reasoned Decisions

In the 173 SPU SIRVA cases in which damages were the result of a reasoned decision, compensation for a petitioner's actual or past pain and suffering varied from $40,000.00 to $215,000.00, with $90,000.00 as the median amount. Only seven of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[11]

---

[8] The rest of these cases resulting in damages after concession were either reflective of a proffer by Respondent (1,632 cases) or stipulation (29 cases). Although all proposed amounts denote *some* form of agreement reached by the parties, those presented by stipulation derive more from compromise than instances in which Respondent formally acknowledges that the settlement sum itself is a fair measure of damages.

[9] Of course, even though *any* such informally-resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

[10] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

[11] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. Except in one case involving very mild pain levels, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions - occasionally spanning several years, and multiple cortisone injections, were required in these cases. In six cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

### III.   Factual History

The medical records reveal that prior to vaccination, Petitioner (34 years old at the time) suffered knee, left shoulder, and neck pain. Exhibits 4, 7, 10-11. Despite these conditions, Petitioner remained active, participating in triathlons – running and swimming. *E.g.,* Exhibit 7 at 11.

Notably, in March 2017, Petitioner sustained a fall while shoveling snow which resulted in an injury to his left shoulder causing "l[eft] shoulder pain with large labral tear, including SLAP[12] and AIGHL[13], small focal full thickness supraspinatus tear." Exhibit 7 at 6. Despite his orthopedist's recommendation of arthroscopic surgery, Petitioner opted

---

[12] SLAP stands for "superior labral anteroposterior." MEDICAL ABBREVIATIONS at 552 (16th ed. 2020).

[13] AIGHL stands for "anterior band of the inferior glenohumeral ligament." MEDICAL ABBREVIATIONS at 46.

for more conservative treatment. *Id.* He attended PT from April through July 2017, and underwent an ultrasound-guided steroid injection on June 16th. *Id.* at 12; Exhibit 11 at 7-17.

In March 2018, Petitioner complained of neck pain. Exhibit 4 at 23. X-rays were taken, and Petitioner was diagnosed with cervicalgia and muscle spasms. *Id.* at 24. He was prescribed oral steroids and PT. *Id.*; Exhibit 10 at 3-113. Later in 2018, he also received treatment for right knee pain. Exhibit 4 at 18-21; Exhibit 10 at 114-71.

On December 24, 2019, Petitioner received the flu vaccine, administered intramuscularly in his left deltoid. Exhibit 1. Nine days later on January 2nd, he sought treatment for left shoulder pain, described as "aching in quality and moderate in intensity." Exhibit 14 at 9.

At his next appointment on January 31, 2020, Petitioner exhibited "[m]arkedly limited range of motion due to pain raising the possibility of adhesive capsulitis." Exhibit 3 at 32. During the administration of an ultrasound-guided steroid injection into the subdeltoid bursal, Petitioner was observed as having normal biceps, subscapularis, supraspinatus, and infraspinatus tendons; supraspinatus, infraspinatus, and teres minor muscles; and AC joint and no subdeltoid bursa fluid or glenohumeral joint effusion. *Id.*

Obtaining good relief from the January injection, Petitioner did not return for further treatment until four months later on June 2, 2020. Exhibit 4 at 6. Describing a "burning deep ache," he reported a return of "discomfort" for the last month. *Id.* He was assessed as having "suspected subdeltoid bursitis following flu vaccination" and "capsulitis of [the] left shoulder." *Id.* at 7. When Petitioner was seen in person on June 18th, however, the orthopedist observed that he "demonstrate[d] good, pain-free ROM." Exhibit 4 at 4. Although not ultrasound-guided, a second steroid injection was administered into Petitioner's bursa. *Id.* at 5.

At his next orthopedic appointment on October 12, 2020, Petitioner reported that "[h]e derived no benefit from the last subacromial injection that he received." Exhibit 5 at 3. He exhibited 170 degrees of forward flexion with "pain through the impingement zone" and internal and external arm rotation of sixty degrees, as opposed to the normal range of 90 degrees. *Id.* The orthopedist ordered an MRI (*id.* at 4), performed on November 5th, which showed "[t]hinning and partial-thickness bursal surface and interstitial tearing of the supraspinatus and infraspinatus tendons, [n]o full thickness rotator cuff tear, [e]xtensive labral tear with partial detachment, [f]ocal bone marrow edema at the greater tuberosity, . . . [f]ocal subacromial spur, [and] [m]ild subacromial subdeltoid bursitis" (Exhibit 5 at 7).

6

On January 8, 2021, Petitioner visited a different orthopedist, seeking treatment for his left shoulder pain. Exhibit 18 at 6. Indicating he had undergone therapy and multiple injections, and had also been prescribed a Medro Dosepak,[14] Petitioner reported pain since receiving a flu vaccine on Christmas Eve of 2019. An entry included in this medical record mentions Petitioner's "history of a partial cuff and SLAP tear after he fell shoveling snow." *Id.* Upon examination, Petitioner exhibited normal ROM and strength with no scapular winging, deformities, or point tenderness. *Id.* at 6-7.

The orthopedist informed Petitioner that the next step would be arthroscopic repair of Petitioner's labral repair and rotator cuff debridement, and ordered another ultrasound-guided steroid injection. Exhibit 18 at 7. During the injection (performed on January 29, 2021), Petitioner was again observed to have a normal biceps tendon; subscapularis, supraspinatus, and infraspinatus tendons; supraspinatus, infraspinatus, and teres minor muscles; and AC joint and no subdeltoid bursitis or shoulder joint effusion. *Id.* at 8; *see also* Exhibit 13 at 8 (facility's record of ultrasound-guided injection).

In his first declaration,[15] signed on February 18, 2021, Petitioner described numerous limitations in his abilities to perform daily tasks such as driving and taking out the trash, to exercise as he previously had, and to perform his job. Exhibit 2 at ¶¶ 9-16. He also indicated that his PCP prescribed a round of oral steroids on January 2, 2020, an assertion not supported by the medical records. *Compare id.* at ¶ 12 *with* Exhibit 3 at 19-28 (showing only an order for x-rays and no additional medication).

Petitioner did not seek treatment again until October 18, 2022, when he returned to his PCP, complaining of "increased pain with movement and decreased ROM." Exhibit 16 at 1 (no capitalized letters in the original). Petitioner again reported undergoing PT, adding that he "[w]as most helped by ultrasound guided injections." *Id.* Providing a referral to the orthopedist who treated Petitioner in January 2021, the PCP recommended PT and another ultrasound-guided steroid injection, expected to be administered on October 22nd. *Id.* at 2. It is not clear whether Petitioner underwent this further treatment as no additional medical records were filed.

On October 18th, Petitioner also signed and filed a supplement declaration, maintaining that "the pain in [his] shoulder ha[d] not subsided and [he] continues[d] to suffer from physical limitations because of the injury." Exhibit 15 at ¶ 7. He also provided additional details regarding his 2017 fall and shoulder injury, maintaining that he suffered

---

[14] There is no evidence in the medical records indicating Petitioner attended PT or was prescribed oral steroids.

[15] Petitioner's declaration was signed under penalty of perjury as required by 28 U.S.C.A. § 1746. Exhibit 2.

only "a slight labrum tear [which] . . . never stopped [him] from doing activities of daily living, tasks in and around the house, competing in athletic events, and doing any of the things [he] wanted in a pain free manner." *Id.* at ¶ 4. Indicating his doctor had recommended against any surgery in 2017, he underwent only limited PT and experienced no pain after August 2017. *Id.*

### IV.     The Parties' Arguments

Emphasizing his swift report of shoulder pain and the overall duration of his injury (charactered as ongoing more than three years post-vaccination), Petitioner seeks $85,000.00 for past and future pain and suffering. Brief at 1, 20. He favorably compares the facts and circumstances in his case with those suffered by the petitioners in *T.E, Hartman, Decoretz, Bergstrom, Russano,* and *Accetta*[16] - decisions featuring awards ranging from $70,000.00 to $95,000.00. Brief at 17-23. Arguing that the overall duration of his injury was longer than those suffered by the petitioners in *T.E., Hartman,* and *Decoretz,* - listed as "just under six months, five months, and approximately ten months, respectively," Petitioner maintains that his pain and suffering award should be greater. *Id.* at 23. When comparing the facts and circumstances in his case to those in *Bergstrom,* he highlights the *Bergstrom* petitioner's three-month delay before seeking treatment and insists that he "did not have breaks in his treatment and treated more consistently than the petitioner in *Bergstrom.*" *Id.* (underlining rather than italics in the original).

Respondent, by contrast, deems Petitioner's injury as mild and his treatment as limited, and thus proposes the lesser sum of $65,000.00 for actual/past pain and suffering. Opp. at 1, 6-7. Mentioning the lack of prescribed PT or pain medication, several gaps in treatment, and the temporary relief provided by multiple steroid injections, he portrays Petitioner's condition as "manageable". *Id.* at 6. Respondent further notes that, subsequent to a report of moderate and aching pain one-month post-vaccination, the record is devoid of any information related to the severity of Petitioner's pain and that "the majority of [P]etitioner's 2021 MRI findings correspond to his unrepaired, *pre-vaccination* left shoulder injury, which included an [sic] *extensive* Petitioner's labral tears (SLAP and AIFHL) and a small focal supraspinatus tear." *Id.* at 6-7 (emphasis in the original).

---

[16] *T.E. v. Sec'y of Health & Hum. Servs.,* No. 19-0633V, 2021 WL 2935751 (Fed. Cl. Spec. Mstr. May 7, 2021) (awarding $70,000 for past pain and suffering); *Hartman v. Sec'y of Health & Hum. Servs.,* No. 19-1106V, 2022 WL 444456 (Fed. Cl. Spec. Mstr. Jan. 14, 2022) (awarding $75,000 for past pain and suffering); *Decoretz v. Sec'y of Health & Hum. Servs.,* No. 19-0391V, 2021 WL 2346468 (Fed. Cl. Spec. Mstr. May 7, 2021) (awarding $75,000 for past pain and suffering); *Bergstrom v. Sec'y of Health & Hum. Servs.,* No. 19-0784V, 2021 WL 5754968 (Fed. Cl. Spec. Mstr. Nov. 2, 2021) (awarding $80,000 for past pain and suffering); *Russano v. Sec'y of Health & Hum. Servs.,* No. 18-0392V, 2020 WL 3639804 (Fed. Cl. Spec. Mstr. June 4, 2020) (awarding $80,000 for past pain and suffering); *Accetta v. Sec'y of Health & Hum. Servs.,* No. 17-1731V, 2021 WL 1718202 (Fed. Cl. Spec. Mstr. Mar. 31, 2021) (awarding $95,000 for past pain and suffering).

Respondent insists Petitioner has not provided sufficient evidence linking his later treatment (which followed a twenty-month gap, and coincided with the filing of his motion for a ruling on the record) to his earlier SIRVA injury, rather than the result of a pre-existing labral tear. *Id.* at 9.

Respondent also questions the relevance of Petitioner's comparable cases, noting that they involved more extensive treatment, such as PT, that was not required in this case. Opp. at 7-8. Respondent instead proposes *Clendaniel* and *Edens*,[17] in which petitioners received pain and suffering awards of $60,000.00 and $70,000.00, respectively, as more accurate comparable cases. *Id.* at 8.

In his reply brief, Petitioner repeats the assertions made in his initial brief regarding the timing of his treatment and duration of his injury. Reply at 2. He insists that his injury was more severe than those experienced by the petitioners in the two comparable cases cited by Respondent. The *Clendaniel* petitioner, for example, waited three months before seeking treatment, with a course of only 14 months, while the *Edens* petitioner's limited number of appointments (seven) and relief obtained from steroid injections also make that case distinguishable. *Id.* at 2-3. He argues that his proposed comparable cases are more analogous to Petitioner's circumstances. *Id.* at 4-5.

### V.   Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

When performing the analysis in this case, I review the record as a whole to include the medical records, declarations, affidavits, and all other filed evidence, plus the parties' briefs and other pleadings. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

A thorough review of the medical records reveals that Mr. McKenna suffered a moderate to mild SIRVA injury for approximately thirteen months. He experienced the most significant pain and limited ROM during the first month post-vaccination, but obtained good relief for approximately three months from the first ultrasound-guided

---

[17] *Clendaniel v. Sec'y of Health & Hum. Servs.,* No. 20-0213V, 2021 WL 4258775 (Fed. Cl. Spec. Mstr. Aug. 18, 2021); *Edens v. Sec'y of Health & Hum. Servs.,* No. 19-1110V, 2021 WL 2182720 (Fed. Cl. Spec. Mstr. Apr. 26, 2021).

9

steroid injection he received. Although his pain returned, and continued for approximately nine months with no benefit obtained by a second injection,[18] his symptoms did not appear to be as severe. On several occasions, Petitioner was observed as having full ROM. Exhibit 4 at 4; Exhibit 18 at 6-7. And he did not undergo surgery as part of his treatment.

Although Petitioner maintains that he continued to experience symptoms beyond late January 2021, when he received his third steroid injection,[19] the record does not support his assertion. The gap in treatment especially undermines his contention. He sought no additional treatment until October 2022, almost 21 months after his last treatment, and after the filing of the Petition in this case. Although the worldwide COVID Pandemic offers *some* explanation for the minimal amount of treatment pursued by Petitioner in 2020, it would not explain a lack of treatment during the remainder of 2021 and 2022, especially if the injury was as severe and persistent as alleged.

Given the significant relief Petitioner obtained from the first steroid injection he received, it is logical to believe he obtained good relief from the third steroid injection, which was also administered with the assistance of ultrasound imaging. Furthermore, any symptoms experienced following the 21-month gap in treatment thereafter could be attributed to the still existing and considerable left shoulder damage sustained during Petitioner's 2017 fall.

It is important to note as well that Petitioner's filings contain substantial mischaracterizations and errors which undercut the arguments he presents. For example, in his supplemental declaration he indicated that his 2017 fall resulted in only "a *slight* labrum tear," and maintained that his "doctor advised *against* surgery because the injury was so minor." Exhibit 15 at 4 (emphasis added). But the MRI performed in early May 2017 revealed *significant damage*, including "a 5 mm full-thickness partial width tear of the anterior leading edge fibers of the supraspinatus tendon, . . . [a] [l]ongitudinal split tear of the intra-articular portion of the biceps tendon just proximal to the biceps labral anchor, . . . [and] labral tearing with SLAP tear from 12:00 to 5:00 positions posteriorly and at the anterior/inferior labrum from the 6:00 to 9:00 positions with posterior labral detachment at the labral chondral junction." Exhibit 7 at 6. And there is no evidence indicating the orthopedist recommended against surgery at this time – certainly not for that reason Petitioner cited. Rather, the medical records indicate it was Mr. McKenna who rejected a surgical option. *Id.*; *see,* e.g., Exhibit 7 at 6.

---

[18] Unlike the first steroid injection he received which offered temporary relief, this second steroid injection was not administered with the help of ultrasound imaging. Exhibit 4 at 5.

[19] Like the first steroid injection he received, this injection was administered with the help of ultrasound imaging. Exhibit 18 at 7-8.

Petitioner makes similar mischaracterizations and errors in his briefing. As evidence that he was experiencing significant symptoms in late January **2021**, more than a year post-vaccination, Petitioner mistakenly cited his orthopedist's observations of markedly limited range of motion seen during the first ultrasound-guided injection he received in January **2020**, approximately one-month post-vaccination. Brief at 6 (quoting Exhibit 13 at 3). If accurate, this information would challenge the accounts of only slightly limited or full ROM provided after the May 2021 return of Petitioner's pain. Given that it is clearly erroneous, this further undercuts Petitioner's claims.

Additionally, I find Petitioner's discussion of comparable cases to be flawed. When arguing for a greater amount than the pain and suffering award in *Edens*, he slightly overstated the *Edens* award, indicating it was $75,000.00, rather than the correct amount of $70,000.00. Reply at 3-4; *see Edens*, 2021 WL 2182720, at *1, 7. And when asserting he sought treatment sooner (seven days post-vaccination), he ignores the shorter time frame in *Edens* – six days post-vaccination. Reply at 4; *Edens*, 2021 WL 2182720, at *6.

Petitioner's claim that he should receive a greater award than the *Bergstrom* petitioner is especially unconvincing. Although he correctly observes that the *Bergstrom* petitioner "waited over three months to report her injury" (Brief at 23; *accord.* Reply at 4), he does not also take note of the more severe pain and limitations in ROM the *Bergstrom* petitioner experienced. *See Bergstrom*, 2021 WL 5754968, at *5-6. And when emphasizing the breaks in treatment in the *Bergstrom* case (Brief at 23; Reply at 5), he overlooked similar months-long periods between his own appointments (*see supra* Section III), as well as the 21 PT sessions attended by the *Bergstrom* petitioner (*see Bergstrom,* 2021 WL 5754968, at *5-6).

By contrast, the cases proposed by Respondent, *Edens* and *Clendaniel,* offer better comparisons to the nature and character of SIRVA injury Petitioner suffered. Both involved petitioners who required multiple steroid injections before obtaining complete relief. *Edens*, 2021 WL 2182720, at *6-7; *Clendaniel*, 2021 WL 4258775, at *8. The *Edens* petitioner actually received four cortisone injections over a 20-month period. *Edens*, 2021 WL 2182720, at *6-7. But despite the temporary relief provided by the injections, the *Edens* petitioner's injury still spanned more than two years. *Id.* at *6. And unlike Petitioner, she was prescribed medication. *Id.*

Although the *Clendaniel* petitioner often suffered more severe pains levels, he (like Petitioner herein) obtained some relief from the steroid injections he received. *Clendaniel*, 2021 WL 4258775, at *8. And he delayed seeking treatment until 26 days post-vaccination – a period more than *three times longer* than in this case. *Id.*

Thus, I find $65,000.00 (as Respondent proposed) – a figure falling between the pain and suffering awards in *Clendaniel* and *Edens* - to be appropriate.

## Conclusion

For all of the reasons discussed above, and based on consideration of the record as a whole, **I award Petitioner a lump sum payment of $65,000.00, representing compensation for actual pain and suffering,[20] in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act. *Id.*

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[21]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[20] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[21] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.